NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0004n.06

No. 10-1964

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

*Jan 04, 2012*

LEONARD GREEN, Clerk

STEVEN SCOZZARI,
Representative of the estate of
William Christi Scozzari,

    Plaintiff-Appellee,

v.

DWAYNE MIEDZIANOWSKI and
JEREMY McGRAW,

    Defendants-Appellants,

and

CITY OF CLARE and KEN HIBL,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

**O P I N I O N**

Before: McKEAGUE and WHITE, Circuit Judges; ZOUHARY, District Judge.[*]

**HELENE N. WHITE, Circuit Judge.** In this civil-rights action under 42 U.S.C. § 1983, Defendants Dwayne Miedzianowski and Jeremy McGraw (collectively, "Defendants" or "the Officers") appeal the district court's denial of their motion for summary judgment on qualified-immunity grounds. We **AFFIRM**.

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

## I. BACKGROUND

**Factual Background**

Plaintiff is the brother of William Scozzari, who was shot and killed in front of his cabin at the Lone Pine Motel in Clare, Michigan, in September 2007.[1] Scozzari was a rather small man (5'3", 133 lbs.) of 51 years when he died. According to Plaintiff, Scozzari was hard of hearing and was blind in one eye, with diminished sight in the other. He frequently wore an eye patch, causing at least one neighbor to assume that he was blind in one eye. Scozzari was wearing a patch when he was shot, but it is unclear whether it covered his eye or simply pressed against his forehead. Plaintiff also alleges that Scozzari had a bad hip. The record contains no medical evidence to corroborate this assertion, but one neighbor observed that Scozzari walked with a limp and usually with a cane; another testified that Scozzari sometimes walked at a fair pace and sometimes just shuffled along.

The Lone Pine Motel is a collection of two-story buildings and stand-alone cabins offering overnight stays and extended lodging. Before his death, Scozzari had been living alone for several years in Cabin 17. The motel owner, Timothy Rynearson, had been Clare's Chief of Police until 2005. Rynearson described Scozzari as a short, disheveled man, a loner who "stuck out like a sore thumb" in this small town, and who typically wore unlaced boots and a winter jacket in the summer. Scozzari kept to himself, seldom had visitors and was generally averse to people; he preferred to go out at night, when there was no one else around. Scozzari was also a "pack rat" who loved to collect

---

[1]In this opinion, we refer to the plaintiff, Steven Scozzari, as "Plaintiff," and to the decedent, William Scozzari, as "Scozzari."

knives and hatchets, which he displayed throughout his cabin. However, Rynearson never saw Scozzari with a weapon outside his cabin.

Plaintiff asserts that Scozzari was diagnosed with schizophrenia in his mid twenties and had been hospitalized due to his illness in the past; however, he was not taking medication when these events took place. Neighbors described Scozzari as mentally challenged and somewhat of a hermit. A neighbor recalled that once, in response to a friendly wave, Scozzari gave him "this look like he was growling or snarling or whatever and just looked away. The neighbor assumed from Scozzari's demeanor that he had some kind of mental disturbance. Rynearson testified that Scozzari communicated mostly by grunting, but added that he was not aware of any instance in which Scozzari argued with, yelled at, or threatened anyone. Rynearson recalled that everyone on the police force knew Scozzari when Rynearson was chief and that Scozzari was never in any trouble.

Around 11 P.M. on September 18, 2007, Police Chief Dwayne Miedzianowski responded to a report that gun shots had been heard in a park adjacent to the Lone Pine Motel. While investigating, he noticed a man later identified as Scozzari coming around a nearby building and walking toward the motel. Scozzari carried what appeared to be a stick or a cane on his shoulder, a backpack[1] and a flashlight, which he briefly directed at Miedzianowski's vehicle. Miedzianowski radioed Officer Jeremy McGraw for assistance and stepped out of his car to speak with Scozzari. Miedzianowski asked Scozzari to drop the stick and to come closer, but Scozzari responded, "Fuck

---

[1]Plaintiff disputes whether Scozzari carried a backpack on the night in question.

you, boy" and continued walking. This reaction caused Miedzianowski to wonder if Scozzari was the armed person who had fired gunshots in the park.

With Miedzianowski following at a distance, Scozzari proceeded toward the motel, looking back over his shoulder from time to time. Miedzianowski ordered, "Stop, police, put the stick down," but Scozzari again responded "Fuck you," and continued into the motel parking lot. Miedzianowski approached within ten feet of Scozzari and repeated his order; this time, Scozzari turned around, said "Fuck you" and pulled the stick back in his left hand, as if intending to hit the officer. Miedzianowski backed up, took a position behind a nearby truck and yelled at Scozzari to drop his weapon. Scozzari lowered the stick, but again yelled "Fuck you" and advanced toward Miedzianowski, who responded with pepper spray. Scozzari yelled, "You fucking want [sic]," reached into his waistband and pulled out what Miedzianowski took to be a knife. Drawing his service weapon, Miedzianowski yelled back for Scozzari to put the knife away. Scozzari complied slowly, turned and walked into Cabin 17, closing the door behind him. At this time, Miedzianowski believed that he had been assaulted.[2]

Officer McGraw arrived at the motel a few minutes later. In his police report, McGraw noted:

> The Chief informed me that he had just dealt with a male that had pulled out a possible cane and threatened him. . . . [W]hen he spoke with the male he pulled out what appeared to be a cane, walked after him waving it and stating, "Do you want to

---

[2]Plaintiff disputes whether Scozzari drew a knife during this encounter because Scozzari was wearing pants four or five times too large for him, making it difficult to keep a knife concealed in the waistband. Plaintiff also disputes whether Miedzianowski used pepper spray at all because none of the witnesses recalled smelling pepper spray on Scozzari's clothes after the incident.

> go boy?" or something to that extent. The Chief . . . took cover behind a vehicle to protect himself and the male walked away and entered cabin 17. The Chief stated he believed that the male possibly had some mental issues.

McGraw did not mention that Scozzari pulled a knife on Miedzianowski, or that Miedzianowski pepper sprayed and drew his gun on Scozzari.

The Officers returned to Cabin 17; by their own account, they were now intent on arresting Scozzari. They positioned themselves on either side of the cabin entrance, McGraw to the right, within arm's reach of the door, Miedzianowski further away on the left. McGraw drew his taser and struck the door loudly several times, shouting: "Police, open the door." When the door opened, McGraw saw Scozzari a foot away from him, arms raised above his shoulders, with a military knife in one hand and a hatchet in the other. Both blades were sheathed, but Scozzari seemed to be fumbling with his hands to unsheathe the knife. Scozzari took a step toward McGraw, who backed up and fired the taser, apparently without effect; Scozzari turned back into the cabin and shut the door. Thinking he had gone to get more weapons, the Officers tried to kick open the door. The door opened, either under their blows or from the inside, and Scozzari appeared in the doorway, still wielding the knife and hatchet and still fumbling with the sheaths. The Officers backed up a few steps and ordered Scozzari to drop his weapons, but he yelled back: "You drop your weapons." Leaving the cabin threshold, Scozzari took a few steps onto the sidewalk in McGraw's direction. Fearing for his life, McGraw stepped back and tripped on a wooden barrier 12 to 18 inches high, between the sidewalk and the adjacent parking lot. McGraw landed on his back and tried to scurry backward, stand up and reach for his gun all at once; meanwhile, Scozzari continued to advance, stepping over the barrier with his hatchet now unsheathed. When Scozzari was within two to four

5

feet of McGraw, Miedzianowski fired four shots at Scozzari from about ten feet away. Scozzari appeared to stop and turn toward Miedzianowski; at that moment, McGraw drew his weapon and fired seven rounds. Scozzari turned toward his cabin, took two or three steps and fell face down over the wooden barrier, still clutching the knife and hatchet in his hands.

Several motel tenants witnessed the incident; however, their accounts sharply contradict Defendants'. Jason Miller, the person who initially reported shots fired near the motel, testified that he was standing in the parking lot when he heard voices yelling "Get away, kid," "knife," and other unintelligible words. Miller observed Miedzianowski running across the motel grounds and saw McGraw arrive shortly thereafter. The Officers conferred together briefly and, as they walked away, Miller heard Miedzianowski say, "He's going to jail tonight," and something that sounded like "mental problems" or "mental issues." During the actual shooting, Miller stood facing Scozzari's cabin, about 40 feet away from the doorstep. He watched the Officers take positions on either side of the cabin, bang loudly on the door and yell, "Put the knife down" a dozen times. The door began to open and Miller observed Miedzianowski back away about ten feet; however, he lost sight of McGraw. The Officers resumed shouting, "Put the knife down" and the door stopped moving, but remained narrowly ajar. Miller heard a popping sound and saw a blue spark characteristic of a taser being fired, and the cabin door slammed shut. When it reopened, Miller heard a new voice say: "Put your gun down," or "Put gun down. Gun down." A male silhouette appeared in the doorway with his left arm extended in front of his body, holding something six to seven inches long. There was a volley of gunfire and Miller saw the man collapse. McGraw reentered Miller's field of vision as the Officers approached the body.

6

Wanetta Gibbons, a long-term motel resident, awoke to the sound of yelling voices. From her window, Gibbons had a sideways view of the front of Cabin 17. She observed two policemen facing the cabin and yelling "Drop the knife" at Scozzari, who was standing on the sidewalk in front his door. Scozzari had his arm extended in front of him, but Gibbons did not see anything in his hand. Scozzari took one or two steps forward, stepping over the small wooden barrier as he did so, and the Officers fired their weapons. Gibbons testified that Miedzianowski and McGraw were about 15-20 feet away from Scozzari when they shot him, and that they remained standing throughout the incident.

Jeffrey Richardson lived in the cabin adjacent to Scozzari's. He heard loud voices, footsteps running toward Scozzari's cabin, a door being slammed or kicked open and a taser being fired. Through his window, Richardson saw two police officers 10 to 12 feet away from Scozzari's cabin, their guns trained on the doorway, yelling at someone to drop his weapons. From his vantage point, Richardson could see to the edge of the sidewalk in front of Scozzari's cabin, but Scozzari never stepped forward enough for Richardson to see him. Richardson saw McGraw trip slightly over the wooden barrier as he backed away from Scozzari's cabin. However, Richardson testified that McGraw did not fall and was standing for several minutes before the actual shooting.

Jeffrey Morgan II was visiting his girlfriend in Cabin 19, two doors down from Scozzari, when he saw a flashlight shine outside. Through a window, he watched the Officers order Scozzari to come out of his cabin and drop his weapon. Morgan briefly caught sight of Scozzari before the taser was fired; otherwise, he did not see Scozzari or hear him speak. According to Morgan, McGraw deployed his taser and fired his gun from the same position, about 20 feet away from

Scozzari's cabin. McGraw was standing throughout the incident and fired the first shot; however, Morgan could not see Miedzianowski due to his viewing angle.

The Officers described the aftermath of the shooting as follows. When Scozzari collapsed, Miedzianowski radioed for an ambulance; however, in case Scozzari was faking injury, the Officers held back for a minute before approaching him. During this interval, McGraw heard gurgling sounds coming from Scozzari's mouth and observed his body shaking. After a minute had passed, Miedzianowski covered McGraw with his weapon while McGraw approached and removed the hatchet and knife from Scozzari's hands.[3] A large pool of blood had formed near Scozzari's mouth and neck; McGraw felt for a pulse and, finding none, rolled Scozzari onto his back and handcuffed his wrists over his chest. The Officers took no medical or resuscitative action until the ambulance arrived. McGraw testified that several people emerged from nearby cabins and that Miedzianowski had them observe the knife and hatchet in Scozzari's hands, but Miedzianowski did not recall doing so.

Once again, the Officers' account contrasts with statements of other witnesses. From their room on the second floor of the main motel building, Jeffrey Morgan Sr. and his minor son heard a rapid succession of firecracker-like explosions. Morgan Sr. stepped out onto the balcony and saw the Officers, weapons drawn, standing about 20 feet from Scozzari and yelling at him to drop his weapons. Scozzari was lying on the sidewalk in a pool of blood, his head and arms near the door to his cabin. Morgan Sr. did not see any weapon in Scozzari's hands or elsewhere. One Officer then

---

[3]McGraw also claims that he removed approximately three other knives that were in Scozzari's waistband or lying on the ground nearby; Miedzianowski's report does not mention this.

stepped over Scozzari's body, entered the cabin and returned with a knife and a hatchet, which he placed on the ground away from the body. The Morgans went back to their room for a few minutes and when they returned, the weapons were near Scozzari's head.

Jeffrey Richardson did not see McGraw or Miedzianowski go into Scozzari's cabin after the incident. He testified that shortly after the shooting, the Officers knocked on neighboring cabins, including his own, asking the occupants to observe the weapons in Scozzari's hands. Scozzari was lying on the ground, his face almost up to the doorjamb. Richardson saw what appeared to be the butt of a hatchet in one hand.

Morgan and his girlfriend Sheryl Irwin were also called outside. Morgan testified that he saw a knife resting in Scozzari's left palm, which was facing up; the knife was unsheathed and appeared "oddly placed." Irwin also observed a knife, the placement of which did not seem normal to her.

Scozzari was taken to a hospital where he was pronounced dead. An autopsy revealed that he was struck by five bullets, all shot from McGraw's firearm. Two bullets entered Scozzari's body from the front, the others from the back. A ballistics technician testified that two bullets traceable to McGraw's gun entered the front wall of Scozzari's cabin at a slight downward angle, suggesting that McGraw was standing upright when he fired them.

**Procedural History**

Plaintiff sued Miedzianowski, McGraw, the City of Clare and City Manager Ken Hibl in connection with Scozzari's death (the City and Ken Hibl are not parties to this appeal). Plaintiff's amended complaint alleges: (I) violation of Scozzari's rights under the Fourth Amendment

(excessive force) and Fourteenth Amendment (deliberate indifference to a serious medical need),

pursuant to 42 U.S.C. § 1983; (II) municipal liability under § 1983; (III) common-law assault and

battery; (IV) gross negligence under Michigan Compiled Laws ("M.C.L.") § 691.1407; (V)

conspiracy to violate Scozzari's civil rights; and (VI) discrimination in violation of the Americans

with Disabilities Act, 42 U.S.C. § 12132.

Miedzianowski and McGraw moved for summary judgment on all claims against them. The

district court granted the motion in part, denied it in part, and held other issues in abeyance. *Scozzari*

*v. City of Clare*, 723 F. Supp. 2d 945 (E.D. Mich. 2010). Relevant to this appeal, the court held the

Officers were not entitled to qualified immunity from Plaintiff's constitutional claims. The court

also ordered the parties to brief two new Fourth Amendment claims, which Plaintiff raised for the

first time in response to Defendants' motion. Finally, the court granted summary judgment for

Defendants on Plaintiff's state-law gross-negligence and civil-conspiracy claims. The district court

later issued its ruling on matters held in abeyance by its previous order. *Scozzari v. City of Clare*,

723 F. Supp. 2d 974 (E.D. Mich. 2010). The court held that Defendants could not assert

governmental immunity from Plaintiff's common-law assault-and-battery claims, but granted

summary judgment for Defendants on the new Fourth Amendment claims because they were not

properly raised in the amended complaint. Defendants timely appealed.[4]

---

[4]During the pendency of this appeal, Plaintiff filed a separate action alleging that Scozzari's
Fourth Amendment rights were violated because: (1) Miedzianowski illegally detained Scozzari
during their first encounter; (2) the Officers' attempt to force their way into Scozzari's cabin
amounted to an unreasonable seizure; and (3) Miedzianowski's use of pepper spray constituted
excessive force. *Scozzari v. McGraw* (*Scozzari II*), 10-13698 (E.D. Mich.). Plaintiff requests that
we review these claims as well. We decline to do so.

No. 10-1964
*Scozzari v. Miedzianowski et al.*

## II. DISCUSSION

This Court reviews *de novo* the denial of a summary-judgment motion based on qualified immunity. *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir. 2003). Summary judgment is appropriate when "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010); *see also* Fed. R. Civ. P. 56, Advisory Committee Notes ("The standard for granting summary judgment remains unchanged" despite 2010 amendments to Rule 56). A court reviewing a motion for summary judgment cannot weigh the evidence or make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010). Rather, the court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

Government officials may invoke qualified immunity as a defense only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine if qualified immunity protects a government

Because this appeal poses the question whether Miedzianowski and McGraw are entitled to qualified immunity as a matter of law from claims that they used excessive force and were deliberately indifferent to Scozzari's medical needs, the two cases are not "inextricably intertwined" such that our decision here will "necessarily resolve[] the pendant claims as well." *Brennan v. Twp. Of Northville*, 78 F.3d 1152, 1158 (6th Cir. 1996) (citations omitted).

official's actions, the Supreme Court prescribes a two-step inquiry: (1) whether the defendant violated a constitutional right; and (2) whether that right was clearly established.[5] *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *see also Aldini v. Bodine*, 609 F.3d 858, 863 (6th Cir. 2010).

> This Court has explained that in qualified-immunity cases,
>
> [s]ummary judgment . . . is proper if the law did not put the officer on notice that his conduct would be clearly unlawful. However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper.

*Vakilian*, 335 F.3d at 515 (citing *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002); *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988)). Summary judgment is also improper where the reasonableness of an officer's action depends on a disputed issue of fact. *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007).

---

[5]  "Some panels of the Sixth Circuit have employed a third step requiring the court to determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009). However, in excessive force cases, the third step is redundant because the defendant's conduct must be objectively unreasonable to find a constitutional violation under the first step. Thus, qualified immunity is a two-step inquiry in excessive force cases. *Binay v. Bettendorf*, 601 F.3d 640, 647 n.3 (6th Cir. 2010) (other citations omitted).

**A. Excessive Force**

Plaintiff contends that Defendants violated Scozzari's constitutional protections against excessive force. Defendants assert they are entitled to qualified immunity because their conduct was objectively reasonable and did not violate clearly established law.

The Fourth Amendment's guarantee against unreasonable searches and seizures protects an individual's right not to be subjected to excessive force in the course of an arrest, investigatory stop, or other seizure of his person. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Aldini*, 609 F.3d at 864. The question is whether the search or seizure at issue was objectively reasonable under the circumstances in which it occurred. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Reasonableness is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 8 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)) (other citations omitted). "Given the extreme intrusion caused by use of deadly force, the countervailing governmental interests must be weighty indeed; 'only in rare instances may an officer seize a suspect by use of deadly force.'" *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (quoting *Whitlow v. City of Louisville*, 39 F. App'x 297, 302-03 (6th Cir. 2002)).

When analyzing the reasonableness of a search or seizure, courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Reasonableness must not be judged retrospectively, but rather from the perspective of a reasonable

13

officer on the scene during the incident. *Id.* In particular, courts must account for "the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 397. Nevertheless, "the fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.'" *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (alteration in *Kirby*).

Defendant Officers argue that their conduct was objectively reasonable and cite *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009), in support. In *Chappell*, police officers executed an early morning search warrant at the home of a fifteen-year old boy ("McCloud") suspected of armed robbery. *Id.* at 904. Using flashlights and with firearms drawn, the officers conducted a protective sweep of the house, during which they found McCloud hiding in his bedroom closet. *Id.* at 904-05. When they ordered him to come out, McCloud emerged holding a serrated steak knife with the blade pointing upward. *Id.* at 905. Ignoring commands to drop his weapon, McCloud moved quickly toward the officers, who shot and killed him. *Id.* On appeal, this Court held that the officers had probable cause to believe that they faced an imminent threat of serious physical harm, stating:

> Considering McCloud's stature (5'7", 165 lbs.) and the size of the knife . . . , it is apparent that if the detectives had hesitated one instant, i.e., long enough to allow McCloud to take even one more step, they would have been within his arm's reach and vulnerable to serious or even fatal injury.

*Id.* at 911. The Court concluded as a matter of law that the officers' conduct was objectively reasonable under the circumstances. *Id.* at 913.

14

Defendants argue that, like the officers in *Chappell*, they had probable cause to believe that Scozzari posed an imminent threat of serious physical harm. However, the differences between *Chappell* and this case are significant. Viewed in the light most favorable to Plaintiff, the evidence indicates that the Officers were standing 15 to 20 feet from Scozzari when they shot him. Further, Scozzari was 51 years old, 5'3' and 133 pounds, blind in one eye and hardly physically intimidating. Additionally, there are genuine issues of material fact whether Scozzari was wielding a knife and hatchet over his head. Further, there is evidence that Scozzari was moving slowly. According to Miedzianowski, Scozzari walked or took "a couple steps" in McGraw's direction; other witnesses recalled Scozzari moving slowly or not at all. In contrast to *Chappell*, the circumstances here present a genuine question whether the situation compelled a split-second decision to use lethal force. *See Estate of Kirby*, 530 F.3d at 482-83 (affirming denial of qualified immunity where, under plaintiff's version of the facts, defendant officers were not in harm's way "and critically, defendants had sufficient time . . . to assess the situation before firing several rounds at" the decedent); *cf. Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Accordingly, the district court did not err in denying Defendant Officers qualified immunity with respect to Plaintiff's excessive-force claim.[6]

---

[6]Miedzianowski also argues that he did not commit a true Fourth Amendment seizure because none of his bullets actually struck Scozzari. The district court declined to address this defense, which was first raised in Defendants' motion for reconsideration. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (explaining that issues raised for the first time in motions for reconsideration are considered waived). An argument not raised in district court is deemed waived on appeal, but this Court will depart from this rule "in exceptional cases or particular

## B.  Deliberate Indifference

Defendants contend that the district court erred in denying their motion for summary judgment with respect to Plaintiff's claim that the Officers were deliberately indifferent to Scozzari's medial needs when they delayed calling for medical assistance after the shooting and prevented emergency responders from treating Scozzari as soon as they arrived.

The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while apprehended by police. *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner."); *Phillips v. Roane Cnty.*, 534 F.3d 531, 539 (6th Cir. 2008).  A claim for deliberate indifference to serious medical needs has both objective and subjective components. *Phillips*, 534 F.3d at 539.  The objective component requires showing the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Phillips*, 534 F.3d at 539.  In a deliberate-indifference claim based on delay of medical care, a constitutional violation arises if the injury in question is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," and the resulting need for treatment was "not addressed within a reasonable time frame." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899-900 (6th Cir. 2004).  To establish the subjective component,

---

circumstances or when the rule would produce a plain miscarriage of justice." *Id.* at 552 (quoting *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993)) (internal quotation marks and citation omitted). These are not exceptional circumstances, as Miedzianowski will have the chance to raise this defense on remand, for instance in a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Therefore, we decline to address it here. *See Scottsdale Ins. Co.*, 513 F.3d at 552 (noting that this Court rarely exercises its discretion to hear arguments waived on appeal).

the plaintiff must "allege facts which, if true, would show that the official . . . subjectively perceived facts from which to infer substantial risk to the [individual], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F. 3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). However, it is not necessary to prove that the officer acted "for the very purpose of causing harm or with knowledge that harm will result." *Id.* (quoting *Farmer*, 511 U.S. at 835).

In the instant case, Defendants knew that the likely cause of Scozzari's collapse was one or more gunshot wounds. Furthermore, as they waited to ensure that Scozzari was not faking injury, the Officers observed a large pool of blood near his neck and heard gurgling sounds coming from his mouth. Lastly, when McGraw felt Scozzari for a pulse, he found none. A layperson under these circumstances would immediately recognize that Scozzari risked serious harm unless given immediate medical attention. Therefore, the questions to resolve are whether medical treatment was unreasonably delayed for non-medical reasons and whether this delay was due to deliberate indifference on the Officers' part.[7] *See Blackmore*, 390 F.3d at 899.

Plaintiff argues that Defendants showed deliberate indifference to Scozzari's medical needs by delaying their initial request for medical assistance and preventing medical responders from treating Scozzari immediately on arrival. Viewed in the light most favorable to Plaintiff, slightly less

---

[7]This Court has explained that, in delay-of-treatment cases, it is not necessary to show that the delay in providing medical care proximately caused the injury. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005). Instead, "the delay alone . . . creates a substantial risk of serious harm." *Id.* (quoting *Blackmore*, 390 F.3d at 899). Therefore, since Scozzari's need for medical care was obvious, whether the delay actually worsened his injuries is irrelevant to the analysis.

than twelve minutes lapsed from the moment the shooting was first reported until Scozzari received

medical assistance. Defendants reported the shooting at 23:26:09, but they did not request medical

assistance until 23:29:28. However, an ambulance was dispatched at 23:27 and reached the Lone

Pine Motel six minutes later, at 23:33. On instructions from Miedzianowski, paramedics initially

staged off-site, approximately a block away. At 23:35, medical responders were allowed to approach

Scozzari, but they were unable to assess his condition until 23:38. The medical responders' log

includes the following comment: "Assessment initially delayed due to restricted access to pt. (crew

directed by PD to approach pt without disterbing [sic] evidence)." (R. 84-6, at 3.) Either during this

assessment or soon afterwards, paramedics were directed to move back so police could check

Scozzari for weapons; treatment resumed after an officer removed two knives from Scozzari's

pockets.

Defendants contend that there is no evidence that they delayed Scozzari's receipt of urgently

needed medical care. However, the record is uncontroverted that, seven minutes after they first

reported the shooting, Miedzianowski and McGraw had not secured the scene of the incident. As

a result, when the ambulance arrived, paramedics were forced to stage off-site for two minutes before

approaching. Even then, the Officers instructed paramedics to proceed without disturbing the

evidence, further delaying Scozzari's treatment by three minutes. In all, it took twelve minutes, from

the initial report of the shooting until paramedics were able to treat Scozzari. Defendants emphasize

that medical responders are frequently required to stage off-site until the scene of a shooting is

secured. However, they fail to explain why they were unable to secure the scene and search Scozzari

before the ambulance arrived. Moreover, there is evidence that the Officers spent at least part of this

time knocking on doors and asking neighbors to witness Scozzari's weapons, activities that were unrelated to securing the scene or saving Scozzari's life.

Viewing the evidence in the light most favorable to Plaintiff, a genuine question of material fact exists regarding whether Defendants acted with deliberate indifference to Scozzari's pressing medical needs. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601, 603 (6th Cir. 2005) (denying qualified immunity to officers who, after severely beating a suspect, locked him in the back of a police cruiser and waited six minutes before calling for medical assistance, during which they greeted each other, prepared for their superiors' arrival, adjusted their uniforms and discussed the severity of the victim's injuries).

The dissent distinguishes *Owensby* as involving a delay in summoning medical assistance after the situation was secure; in contrast, the Officers in this case summoned an ambulance, but did not secure the scene to enable the prompt provision of medical care. However, *Owensby* involved not only the failure to summon medical care, but also the failure to provide medical care:

> [W]e note in summary that each officer viewed Owensby in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later, when Sergeant Watt checked on Owensby and discovered that he was not breathing. This evidence is sufficient to demonstrate that each officer's failure to provide medical care to Owensby constituted a violation of the Fourteenth Amendment.

414 F.3d at 603. Further, as in *Owensby*, there is evidence that the Officers were aware of Scozzari's precarious medical condition but nevertheless engaged in activities unnecessary to their duties. The characterization of the Officers' activities as not "brazenly dilatory behavior" because they merely "interviewed a few witnesses while the ambulance was en route" fails to abide by the requirement

19

that we view the record in the light most favorable to the non-moving party. The record can be viewed to support that the Officers did not interview witnesses to gather their impressions of the event, but rather called on the occupants of nearby cabins to view Scozzari's body and observe the weapons he purportedly brandished during the standoff. When considered together with testimony that Scozzari was unarmed when he was shot and that one of the Officers retrieved knives from his cabin and arranged them around Scozzari's body after the fact, there is a genuine issue regarding whether the Officers were deliberately indifferent to Scozzari's medical needs.

Defendants argue that, even if their behavior amounted to deliberate indifference, they are entitled to qualified immunity because it was not clearly established when this incident occurred that failing to give medical responders immediate access to an injured detainee violates the Fourteenth Amendment. However, a constitutional right need not be expressly recognized to be clearly established. To the contrary, "'general statements of the law' are capable of giving clear and fair warning to officers even where 'the very action in question has [not] previously been held unlawful.'" *Smith*, 430 F.3d at 776-77 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in *Smith*). *See also Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) ("[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." (citing *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002))). Reasonable officers would have known, based on this Circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance, but

20

extends to ensuring that medical responders are able to access the victim without unreasonable delay.

Accordingly, we hold that Miedzianowski and McGraw are not entitled to qualified immunity on

Plaintiff's deliberate-indifference claim.

### C.  Assault and Battery Claim

Under Michigan law, judges, legislators and the highest-ranking appointed official at any

level of government are absolutely immune from tort liability when they act within the scope of their

authority, whereas lower-ranking employees and officials may only seek governmental immunity for

such acts.  M.C.L. § 691.1407(2)-(3), (5); *Odom v. Wayne Cnty.*, 482 Mich. 459, 760 N.W.2d 217,

222-23 (2008).  A lower-ranking official who seeks governmental immunity for an alleged

intentional tort bears the burden to show that:

> (a) The acts were undertaken during the course of employment and the employee was
> acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Odom*, 760 N.W.2d at 228; *Ross v. Consumers Power Co. (On Rehearing)*, 420 Mich. 567, 363

N.W.2d 641, 667-68 (1984).  There is no dispute that Defendants acted or reasonably believed to be

acting within the scope of their authority, or that their actions were discretionary as opposed to

ministerial.  Therefore, the sole question is whether they acted in good faith.

Under Michigan law, a governmental employee lacks good faith, and therefore cannot claim

immunity, when he "acts *maliciously* or with a *wanton or reckless disregard of the rights of*

*another*." *Odom*, 760 N.W.2d at 225 (citing William L. Prosser, *Law of Torts* § 132, at 987-90 (4th

ed. 1971)).  In *Odom*, the Michigan Supreme Court emphasized that determining good faith is not

the same as analyzing whether a defendant's conduct was objectively reasonable. *Id.* at 229. To the contrary, "[t]he good-faith element . . . is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* (citing Prosser, *supra*, § 132, at 989); *see also Szwabowski v. Burdick*, No. 282388, 2009 WL 1440945, 2009 Mich. App. LEXIS 1126, at *3-4 (Mich. Ct. App. May 21, 2009) (remanding for trial court to determine whether defendants' actions were subjectively reasonable); *but see Grawey v. Drury*, 567 F.3d 302, 316 (6th Cir. 2009) (accepting parties' argument that good-faith analysis under Michigan law is "essentially the same" as the objective-reasonableness test for federal qualified immunity).

Defendants assert that the district court erroneously relied on its finding that the Officers' use of force was objectively unreasonable to hold that they also acted in bad faith. We disagree. Admittedly, the court reviewed the same facts and allegations, but evidence useful to determine objective reasonableness can also serve to evaluate good faith. Moreover, if a jury were to credit Plaintiff's version of the facts, it could conclude that the Officers displayed a wanton or reckless disregard for Scozzari's rights that was tantamount to bad faith. *See Odom*, 760 N.W.2d at 225 ("'[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or . . . *such indifference to whether harm will result as to be the equivalent of a willingness that it does*.'" (emphasis added) (quoting *Burnett v. City of Adrian*, 414 Mich. 448, 326 N.W.2d 810, 812 (1982))).

Other parts of the record, when read in the light most favorable to Plaintiff, also support the district court's ruling. For instance, Miedzianowski's comment that Scozzari was "a mental" who

was "going to jail" could be seen as evidence of malice. A reasonable jury could also infer malice or reckless disregard upon finding that Scozzari did not threaten Miedzianowski with a knife during their initial encounter. Similarly, a jury could infer malicious intent from one or more of the eyewitness accounts of what happened both before and after the shooting. *See Tobias v. Phelps*, 144 Mich. App. 272, 375 N.W.2d 365, 369-70 (1985) ("[I]f [defendants] were deliberately indifferent to the decedent's serious medical needs and, therefore, liable under 42 U.S.C. [§] 1983, then they could not have been acting in good faith. . . . [D]eliberate indifference to serious medical needs . . . is utterly inconsistent with good faith." (quotation marks and citation omitted)).

Finally, it is worth repeating that, at this stage of the proceedings, Plaintiff must simply raise a genuine issue of material fact as to the Officers' good faith. By contrast, as the parties seeking to assert governmental immunity, Miedzianowski and McGraw bear the greater burden to prove that they acted without malice. *Odom*, 760 N.W.2d at 225. Plaintiff fulfilled his requirement, Defendants failed to meet theirs.

### III. CONCLUSION

For the reasons set forth above, the order of the district court denying Defendants summary judgment based on qualified immunity is AFFIRMED, and the case is remanded for further proceedings.

No. 10-1964
*Scozzari v. Miedzianowski et al.*

**McKEAGUE, Circuit Judge, concurring in part and dissenting in part.** I concur that Defendants are not entitled to qualified immunity on the claim of excessive force because I agree that the record as a whole indicates that a genuine issue of material fact exists as to whether deadly force was justified.

I dissent from the majority's conclusion that a genuine issue of material fact exists regarding whether Defendants acted with deliberate indifference to Scozzari's urgent medical needs. I cannot conclude, as the majority does, that the slight delay caused by the officers' failure to secure the scene by the time paramedics arrived violated Scozzari's clearly established constitutional rights.

The right at issue is Scozzari's right to receive adequate medical care when injured while being apprehended by the police. *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The question is whether the officers acted with deliberate indifference to Scozzari's serious medical needs. We look to whether, objectively, the officers unreasonably delayed Scozzari's access to medical treatment and whether, subjectively, they consciously disregarded the risk Scozzari faced. As the majority has set out the relevant standards, we turn directly to the facts.

The majority points to two instances of delay: the two minutes that paramedics were "forced" to stage offsite and the three minutes paramedics had to wait due to restricted access to Scozzari. However, a closer examination of the record reveals that it is not clear how long paramedics were staged offsite. The police incident report indicates that Chief Miedzianowski instructed paramedics to stage offsite about a block away at 23:29, when he first radioed for medical aid. At some time before 23:33, paramedics arrived at staging site and waited for clearance to enter the scene. (Paramedic testimony establishes that "staging" and "at scene" are two different things: staging is

24

when paramedics wait for clearance to enter, and "at scene" is the time of arrival onto the scene after receiving such clearance.) At 23:33, paramedics had received clearance and were "at scene," meaning that they pulled up in their vehicle. At 23:35 paramedics were "at patient." The majority's reading of the record—that the ambulance reached the scene at 23:33, then were turned away by Chief Miedzianowski and instructed to stage offsite for an additional two minutes—is simply wrong.[1] The two-minute period from when paramedics were "at scene" (23:33) to "at patient" (23:35) is the time it took the paramedics to park their vehicle, get ready to make contact with Scozzari, and make their way to his location, which included traversing a distance estimated by paramedics to be somewhere between 75-200 feet. Thus, the two-minute period relied on by the majority is time that would have elapsed anyway, regardless of officer conduct.

On this more precise reading of the record, the instruction to stage offsite seems considerably less blameworthy. Chief Miedzianowski gave the instruction to stage offsite when he radioed for medical help at 23:29, meaning simply that the officers had failed to secure the scene at that moment, three minutes after the shooting, not seven minutes after as the majority states. In addition, the three-minute delay from when the paramedics were "at patient" (23:35) to when they were able to assess Scozzari (23:38) simply does not rise to the level of deliberate indifference. While the officers had removed weapons from Scozzari's hands and waistband when they handcuffed him prior to the paramedics' arrival, the officers had neglected to check the rest of Scozzari's body for

---

[1]While we draw all reasonable inferences in favor of the non-movant, the documents and testimony establishing the timeline of events are not disputed. The timeline is established by the Clare Police Department Incident Report, Mobile Medical Response Patient Care Report, and paramedics' testimony.

weapons, requiring paramedics to stop their assessment while police checked again and removed additional weapons from Scozzari's pockets. Such conduct—failing to thoroughly check Scozzari when initially securing him—is negligence at most, falling short of the "conscious[] disregard" required to meet the deliberate indifference standard. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (internal alteration omitted). Plaintiff has not put forward any evidence to indicate that the officers subjectively knew that additional weapons were in Scozzari's pockets and consciously chose not to retrieve them before the paramedics began attending to him.

Of course, there is still the time the paramedics waited at the staging site for clearance to enter the scene, sometime in between 23:29, when Chief Miedzianowski instructed them to stage offsite, and 23:33, when they arrived on the scene. While the exact amount of time the paramedics waited is unclear, it is evident Scozzari's treatment was delayed. R. 71-13, Winifred Bryans Dep., at 5-6 (stating that paramedic Carl Bryans and she were staged and that the ambulance met them at their staged position); R. 71-14, Carl Bryans Dep., at 6 ("I was staged longer than the ambulance was, but I don't recall how long that was."). Viewing the facts in the light most favorable to Plaintiff, there is evidence that one of the officers spent at least part of this time gathering witness testimony, conduct that is part of routine police work but arguably improper in light of Scozzari's condition.

On this record, I find little basis to conclude there is a triable fact issue on the subjective component of deliberate indifference. There is no evidence that the officers thought through the chain of events that could lead to a delay in paramedics' access to Scozzari and then consciously disregarded that risk. But even assuming that the officers' actions raise an issue of fact, the officers are entitled to qualified immunity because the law did not give fair warning to Miedzianowski and

McGraw that their conduct—seeking witnesses to confirm that Scozzari was armed while the ambulance was on its way and before the scene was disturbed by paramedics—was clearly unlawful.

The right of pretrial detainees to adequate medical care is a fairly general one. While a delay-of-treatment claim under the Eighth or Fourteenth Amendments may not quite involve the "factbound morass of reasonableness" that courts must wade through in analyzing a Fourth Amendment claim, *Scott v. Harris*, 550 U.S. 372, 383 (2007), it undeniably involves a generalized framework through which we view the specific facts of each case. The majority finds that this generalized right, standing alone, gave clear and fair warning to the officers in this case that their conduct was unlawful. The only Sixth Circuit case on which the majority relies for substantive guidance is *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005).

*Owensby* does not provide clearly established law for the officers in our case. In *Owensby*, an arrestee died from asphyxiation after he was handled roughly during an arrest, handcuffed, and placed in the back of a squad car. Though the officers subjectively perceived that the arrestee was in significant physical distress, none of the officers summoned or attempted to provide emergency medical aid but rather greeted each other, straightened their uniforms, and waited for their superiors to arrive. An EMT was eventually summoned by a sergeant who arrived six minutes after the incident. This Court affirmed the denial of qualified immunity. *Owensby*, 414 F.3d at 604. What is clearly established in *Owensby* is only that an officer cannot stand around and do nothing where he subjectively perceives a serious medical need and the arrestee has already been secured. The case at hand is different in two significant respects: (1) the scene had not yet been secured, and (2) the

27

officers responded appropriately to Scozzari's obvious need for medical attention by promptly calling for an ambulance.

The majority and I differ over whether the officers' subsequent conduct, which caused a slight delay in paramedics' access to Scozzari, violated clearly established law. The majority attempts to fit this case under *Owensby* by reading *Owensby* to impose a specific duty on police officers that extends beyond promptly summoning an ambulance. They say, "*Owensby* involved not only the failure to summon medical care, but also the failure to provide medical care." However, it is clear that *Owensby* did not break new ground on the generalized "right of pretrial detainees to adequate medical care" but was rather decided as one of the "obvious" cases in which that generalized right sufficed to put officers on notice that their conduct was clearly unlawful. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (noting that in "an obvious case," general standards can clearly establish a constitutional violation, "even without a body of relevant case law"). Where officers, upon observing the secured arrestee in precarious physical condition (prompting one officer to comment, "This looks f–ed up. Can he breathe? It doesn't look like it from the way he's laying."), stood around and displayed *no* intention of *ever* summoning aid, the general right of pretrial detainees to adequate medical care was sufficient to put officers on notice that their conduct was clearly unlawful. *Owensby*, 414 F.3d at 600, 604.

Not only does *Owensby* fail to provide the clearly established law here, no other case in this Circuit or the Supreme Court provides guidance on how an officer must proceed after he has already called for emergency medical services beyond the general admonition not to unreasonably delay access to medical treatment in the face of a serious need. The majority's decision runs afoul of the

28

Supreme Court's repeated exhortation to the lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). Otherwise, the qualified immunity doctrine turns from a guarantee of immunity to "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), into a rule of pleading. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("Plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."). The Supreme Court has noted, for example, that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S. Ct. at 2084 (citing *Saucier v. Katz*, 533 U.S. 194, 201–202 (2001)).

Where a Plaintiff relies solely on the strength of a generalized standard to claim that his constitutional right was violated, it is only in the obvious case that an officer has fair warning his conduct is unlawful. *Brosseau*, 543 U.S. at 199; *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 347 (6th Cir. 2007) (finding that the Fourth Amendment right at issue was clearly established by the general standard in *Tennessee v. Garner* because the facts presented "an obvious case involving the use of deadly force"). The majority states the unremarkable proposition that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance. Indeed, if officers may not delay summoning emergency medical services in the face of an obvious medical need, logic dictates that, once summoned, officers cannot then unreasonably delay or deny paramedics' access to the detainee. But this is merely a reformulation of the same generalized standard, which, again, would be sufficient to govern only the *obvious* case. *E.g., King*

29

*v. Reap*, 269 F. App'x 857 (11th Cir. 2008) (affirming denial of qualified immunity where officers summoned an ambulance but then sent it away without allowing paramedics to examine or assist detainee).

This case is emphatically not the obvious one. Once an officer has summoned emergency medical aid, the only standard governing his conduct is that he may not unreasonably delay access to the patient. While enough to put officers on notice not to engage in brazenly dilatory behavior, this standard alone is insufficient to have made clear to Officers Miedzianowski and McGraw that they could not interview a few witnesses while the ambulance was en route. *See al-Kidd*, 131 S. Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

The majority contends that I fail to view the record in the light most favorable to Scozzari because I describe the officers' conduct as "interview[ing] a few witnesses while the ambulance was en route" when, in fact, the record shows that "the officers did not interview witnesses to gather their impressions of the events but rather called the occupants of nearby cabins to view Scozzari's body and observe the weapons he purportedly brandished during the standoff." I do not see how these two descriptions are different, as both describe officers talking to witnesses. The latter merely goes into the officers' purported subjective intentions for doing so. The officers' purported motivations, however, do not make unclear law clear. Using the majority's language and assuming "that the officers did not interview witnesses to gather their impressions of the events but rather called the occupants of nearby cabins to view Scozzari's body and observe the weapons he purportedly brandished during the standoff," there is still no violation of a clearly established constitutional right.

30

An officer's duty to secure a crime scene necessitates preserving the exact condition of such scene before paramedics and other personnel disturb it. Thus, in any criminal situation where someone is injured, an officer's dual duties to secure the scene and ensure access to adequate medical care are in tension, and no court has mandated a clear procedure that officers must follow. Rather, they are guided by the general directive not to unreasonably delay the patient's access to treatment. This general directive would be sufficient to alert a reasonable officer that he cannot, for example, stall a paramedic's access to a seriously injured patient while the officer dusts every fingerprint or waits for a forensic specialist to arrive or, as in *Owensby*, stand around and do nothing. But it does not put a reasonable officer on notice that they cannot interview a few witnesses—for whatever motivation—while the ambulance is *en route*, especially where, on any reading of the record, the maximum resulting delay was about three minutes.

The majority opinion sweeps too far. What, then, is an officer to do after summoning an ambulance? Are officers now prohibited from engaging in any investigatory duties that might potentially delay paramedics, even by a few seconds? Is there a time limit on how quickly officers must secure a crime scene? I refrain from further engaging in a parade of horribles and merely conclude that I would reverse the district court's determination on the basis that the right at issue here was not clearly established. I respectfully dissent.