RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

THE ESTATE OF THOMAS KIRBY and BRENDA KIRBY,
         *Plaintiffs-Appellees,*

         *v.*

DEPUTY DUVA, DEPUTY CARRIER, and SERGEANT
BUCKLEY,

                    *Defendants - Appellants,*

ST. CLAIR COUNTY SHERIFF'S DEPARTMENT,
                              *Defendant.*

No. 06-1976

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-71884—Robert H. Cleland, District Judge.

Argued: March 18, 2008

Decided and Filed: June 27, 2008

Before: BOGGS, Chief Judge; ROGERS, Circuit Judge; SHADUR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellants. Hugh M. Davis, Jr., CONSTITUTIONAL LITIGATION ASSOCIATES, Detroit, Michigan, for Appellees. **ON BRIEF:** Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellants. Hugh M. Davis, Jr., CONSTITUTIONAL LITIGATION ASSOCIATES, Detroit, Michigan, Patrick J. McQueeney, Thomas R. Present, LAW OFFICES, Clinton Township, Michigan, for Appellees.

_____

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

————————————

**OPINION**

————————————

ROGERS, Circuit Judge.  Defendant police officers bring this interlocutory appeal from the district court's denial of their motion for summary judgment on grounds of qualified immunity. Plaintiffs, Thomas Kirby's widow and estate, filed this § 1983 excessive force action after defendants fatally shot Kirby as he tried to flee a traffic stop.  Because it was clearly established at the time of the shooting that deadly force could not be used against a non-dangerous fleeing felon, qualified immunity was properly denied on the facts as presented in this case.

**I.**

At the time of the events giving rise to this case, defendants Deputy Damon Duva, Deputy Jason Carrier, and Sergeant Thomas Buckley were employed as police officers in the St. Clair County Sheriff's Department[1] and were participants in the St. Clair County Drug Task Force ("DTF").  Sometime in 2003, the DTF received reports that Kirby was selling methamphetamine and crack cocaine out of his home in rural St. Clair County, Michigan.  After setting up two controlled drug sales with Kirby, the DTF obtained a warrant to search both Kirby's residence and person.  On November 4, 2003, the DTF held a strategy meeting to discuss executing the warrant. The DTF had been told by informants that Kirby was a violent, paranoid individual who was often high, kept numerous weapons around his home, and had outfitted his residence with surveillance equipment.  According to one source, Kirby opened the door to his home only with a pointed gun, made visitors undress to prove that they were not wearing police wires, and stated constantly that the police were watching him.  Based on these reports, the DTF decided that it was safest to apprehend Kirby when he was on the road.

After canvassing area roads for Kirby that afternoon, the DTF located Kirby driving westbound on Lapeer Road, apparently having left the scene of a drug sale not long before.  Kirby, in a green Ford Ranger truck, was traveling approximately 55 m.p.h., right around the speed limit. Carrier and Buckley followed the Ranger for a short while before activating the overhead lights and siren on their police cruiser.  After about a half mile or "maybe even a bit less than that," Kirby pulled onto the shoulder of the road.  Carrier, who was driving the cruiser, parked the cruiser a few feet behind Kirby, positioning his vehicle halfway onto the shoulder.  A few seconds later, Duva arrived in an unmarked black Chevrolet Silverado truck.  Duva pulled in front of both vehicles and parked his truck at an angle of approximately forty-five degrees with the Ranger, with its front half resting off of the road, and on the shoulder.  Duva estimates that the front of the Silverado was approximately ten feet in front of the Ranger.  A few feet to the side of the road, running adjacent to it, was a ditch.  This arrangement essentially sandwiched the Ranger between the police vehicles and the ditch so that Kirby could not easily flee.

Observing this scene were motorists Paul Moore and Rose Kornieck, who had been driving behind Kirby's Ranger and the cruiser.  Moore parked his vehicle six to ten feet behind the cruiser, and Kornieck parked behind Moore.  Moore could see the parties' positions, but could not actually observe what Kirby was doing in the Ranger.  Kornieck could see only Buckley and the Ranger.

After parking the cruiser, Deputy Carrier approached the Ranger.  Yelling, he ordered Kirby to turn off his vehicle and to raise his hands.  Kirby did not obey.  It is unclear whether Kirby had heard the orders; however, his windows were up and the cruiser's siren was sounding.  At this time,

————————————

[1]The St. Clair County Sheriff's Department was a defendant to this suit as well, but was granted summary judgment on all counts against it by the district court.

Sergeant Buckley had already exited the cruiser on the passenger side and had begun to move forward toward the Ranger. Deputy Duva had also gotten out of the Silverado by then and was walking around its rear toward the Ranger.

The parties' accounts of the events that next unfolded, and that led to the fatal shooting, diverge significantly. According to Buckley, as he was walking on the shoulder of the road, the Ranger began to "back[] up towards [him]." He states that he heard the Ranger's engine revving, observed the truck's backup lights come on, and saw gravel flying from its tires. There was a distance of less than two feet between himself and the Ranger, Buckley estimates, as it came at him in reverse, traveling seven to eight miles per hour. Buckley testified that he tried to get to the Ranger's side by stepping backwards and sideways, but could not avoid the vehicle, which backed up approximately twelve feet. Buckley claims that as he was pushed backward by the Ranger, he was forced to hang on to its tailgate. Buckley states that he then began to lose his balance and slipped down a muddy embankment towards the ditch. Fearing for his life, Buckley fired his gun into the Ranger four to five times. Buckley aimed at Kirby's head with each shot, "shooting to kill him."

Seeing the Ranger move towards Buckley and hearing gunshots, Carrier and Duva also opened fire on Kirby. Both officers testified that they had seen Buckley slip behind the Ranger and feared that he would be run over as that vehicle reversed. At this time, Carrier was standing a few feet to the side of the Ranger, near its driver-side door. Carrier admits that he was not in danger. Duva claims to have been standing at the Silverado's rear passenger-side wheel well, and was similarly not then at risk.

Defendants claim that the Ranger briefly came to a stop after this first round of shots. They state that the Ranger then, however, lurched forwards towards Duva, its engine again revving. By one of the defendant's estimates, the truck drove forward at seven to eight miles per hour, and moved perhaps five feet. Fearing that he would be crushed between the Silverado and the Ranger, Duva again opened fire on Kirby. Carrier and Buckley followed suit. Buckley admits that he could see Carrier and knew that Carrier was neither in front nor back of the vehicle, and that Buckley could not actually see Duva to know whether he was in the Ranger's path.

According to defendants, these events were nearly instantaneous. Carrier, for example, testified that the entire incident occurred over the span of only 15-45 seconds.

Defendants' account is largely supported by Kornieck's testimony. Kornieck stated that she observed Buckley hanging off of the Ranger as it reversed and that the Ranger was kicking up gravel. She does state, however, that Buckley was at the Ranger's rear passenger-side wheel well, not its back tailgate. Nonetheless, Kornieck still believed that Buckley was going to be killed by the moving vehicle.

Plaintiffs, relying primarily on the testimony of Moore, tell a different story. By Moore's account, the Ranger was moving in a non-threatening manner around the vehicles and officers. Moore testified that after Kirby initially pulled over, the Ranger began to roll backwards at an angle, almost as though Kirby "was trying to pull out of a parallel parking spot to get around [the Silverado]." Moore states that the Ranger was slowly rolling in reverse and that its backup lights were not on. It was "[n]ot [going] very fast." Moore also disputes that the Ranger's engine was revving and that its wheels were spinning and throwing gravel.

More importantly, under Moore's version of the story, none of the officers was ever in harm's way. From Moore's view, the Ranger was parked only three to six feet in front of the cruiser. When the Ranger began to reverse, Moore claims that Buckley was at the cruiser's front passenger-side tire, placing him at least six to seven feet behind the Ranger's rear. Because the

Ranger would have hit the cruiser had it gone any further back, it "could have never come in contact with [Buckley]." The Ranger backed up a few feet at most, Moore estimates.

Rather than staying in his position of safety, as Moore saw it, however, Buckley approached the moving vehicle. Moore claims that Buckley continued to walk towards the rear of the Ranger as it rolled backwards before Buckley stepped sideways down onto the embankment. Buckley did not "dive" out of the way as though he were in danger, but merely stepped aside and kept moving forward. When the Ranger then changed direction and moved a few feet forward, Buckley continued to "walk [forward] towards Mr. Kirby's vehicle." As he got closer to the Ranger, Buckley turned and tried to "scurry" back up the embankment toward the road and that vehicle, at this point raising his gun. However, as Buckley "scurried back up," he began to slip in the mud and grabbed onto the Ranger at its rear passenger-side wheel well to pull himself up. Thus, Buckley was never, Moore asserts, pushed backwards by the Ranger, but was actually using it for balance.

Moore likewise asserts that Duva was not in the path of the Ranger as it moved forward, which movement he claims occurred before Buckley began firing. According to Moore, after going backwards for a few feet, the Ranger reversed and began to move slowly forward a few feet "as if it was trying to steer . . . around the rear end of the [Silverado]." At this point, Moore states, Duva was still at the back of the Silverado, and thus could not have been struck. Because of the proximity of the Silverado and Ranger, the vehicles being only four to six feet apart by Moore's estimates, and the angles at which they were parked, the Ranger "couldn't get around [the Silverado]."

Moreover, even assuming that the Ranger once posed a danger, by Moore's account it had stopped moving before shooting broke out. Realizing that he could not maneuver forward around the Silverado, Kirby "stopped trying" and brought the Ranger to a complete stop. Moore claims that by the time that Buckley made it back up the embankment and began shooting, the Ranger had been stationary with its brake lights on for a few seconds. And, at that point, Buckley was still "a couple of feet" to the side of the Ranger's rear passenger-side wheel well, well out of harm's way. Moore also testified that five to six seconds passed between when the first officer, Buckley, and the second officer, Duva, began firing. This is because, explained Moore, Duva was still coming around the back of the Silverado when Buckley began firing.

Reports compiled by plaintiffs' accident reconstruction and ballistics experts corroborate Moore's testimony. Those reports suggest not only that the Ranger was stationary when defendants shot at Kirby, but that it had not posed a risk to anyone in the first place. After examining ballistics evidence and footprints left at the scene, the experts concluded that Buckley was not at the Ranger's rear when he fired, but was at its rear passenger-side wheel well. The experts similarly determined that Duva was positioned at the Silverado's rear by analyzing his two shots, both of which struck only the Ranger. In light of these and other findings, plaintiffs' experts concluded that Kirby had not intended to, and indeed could not have, hurt any of the defendants.

Kirby, who had been shot multiple times, was pronounced dead when medical officials arrived at the scene shortly thereafter. A subsequent police investigation revealed that the officers had fired a total of thirteen shots at Kirby: Buckley fired eight shots, six of which hit Kirby; Carrier fired three shots, all of which hit Kirby; and Duva fired two shots, neither of which hit Kirby. The investigation also disclosed that Kirby was not carrying a weapon at the time of the shooting. However, multiple firearms, as well as drugs and drug paraphernalia, were discovered during a search of the Kirby residence.

On May 12, 2005, Brenda Kirby, the deceased's widow, brought suit against defendants. In addition to the § 1983 excessive force claim currently at issue, plaintiffs' complaint made out claims for violation of ministerial duties, negligent and intentional infliction of emotional distress, and gross negligence. Defendants moved for summary judgment on all claims. With respect to the

§ 1983 claim, defendants argued that the underlying excessive force claim was without merit, and that, in any event, the officers were protected from suit by qualified immunity.

The district court granted defendants' motion on all claims except for the § 1983 claim. With respect to that cause of action, the district court concluded that factual disputes concerning the shooting precluded a grant of qualified immunity. Based on the supported factual version most favorable to plaintiffs, that Kirby was slowly driving around the officers and had brought the Ranger to a stop before the shootings, the district court determined that a reasonable jury could find that defendants had used excessive force in repeatedly shooting Kirby. The district court also held that Kirby had a clearly established right to be free from such excessive force.

Defendants then filed this interlocutory appeal, challenging the district court's denial of qualified immunity. Plaintiffs responded by filing a motion to dismiss the appeal for lack of jurisdiction, contending that interlocutory review was inappropriate because defendants were only making factual arguments.

## II.

As a threshold matter, this court has jurisdiction over defendants' interlocutory appeal notwithstanding their failure to accept entirely plaintiffs' version of the events for purposes of the appeal. Title 28 U.S.C. § 1291 limits appellate jurisdiction to "final decisions of the district courts." A district court's denial of qualified immunity is a final decision for purposes of § 1291 only "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Consequently, this court cannot hear an interlocutory appeal challenging "a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). This court, however, "retain[s] jurisdiction over the legal question of qualified immunity, *i.e.*, whether a given set of facts violates clearly established law." *Boyd v. Baeppler*, 215 F.3d 594, 596 (6th Cir. 2000).

Defendants' primary argument in challenging the denial of qualified immunity is that there was no violation of a clearly established constitutional right even under plaintiffs' factual accounts because reasonable police officers in defendants' positions would have feared for their safety. Defendants allege that the district court, in denying summary judgment, improperly relied on the legal conclusions of Moore and failed to review the record from the perspective of a reasonable police officer.

To the extent that defendants make only these arguments, there is jurisdiction over their interlocutory appeal. In *Mitchell v. Forsyth*, 472 U.S. at 530, the Supreme Court held that interlocutory review is permitted where a defendant argues merely that his alleged conduct did not violate clearly established law. This legal question regarding qualified immunity is independent from the question of whether there are triable issues of fact. If not addressed now, qualified immunity will be forever lost.

To the extent that defendants challenge the accuracy of Moore's factual statements, however, this court is without jurisdiction. A defendant who files an interlocutory appeal after the denial of qualified immunity "is required to limit her argument to questions of law premised on facts taken in the light most favorable to the plaintiff." *Meals v. City of Memphis*, 493 F.3d 720, 726-27 (6th Cir. 2007). Defendants here are not willing to do that entirely. At several points in their appellate brief, defendants continue to allege facts contrary to plaintiffs' account of the shooting, claiming, among other things, that Buckley was "*pushed* into the ditch" by the Ranger and that Duva was positioned at the Silverado's rear passenger-side wheel well when shooting broke out.

That defendants make the occasional factual argument does not, however, destroy jurisdiction over the legal issue of whether there was a violation of a clearly established

constitutional right. As this court has frequently observed, "[i]f . . . aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (internal citations and quotation marks omitted). Consequently this court may simply ignore defendants' attempts to dispute plaintiffs' version of the facts, "obviating the need to dismiss the entire appeal for lack of jurisdiction." *Id.*

## III.

The district court properly denied defendants summary judgment based on qualified immunity. Qualified immunity is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is not available in this case, however, because, first, "considering the allegations in a light most favorable to the party injured, a constitutional right has been violated," and, second, "that right was clearly established." *See Estate of Carter*, 408 F.3d at 310.

## A. Constitutional Violation

The plaintiffs' version of the events, relied upon by the district court, supports a holding that defendants violated Kirby's Fourth Amendment right to be free from excessive force. Under that version, the Ranger was moving slowly and in a non-aggressive manner, could not have hit any of the officers, and was stationary at the time of the shooting. Consequently, reasonable police officers in defendants' positions would not have believed that Kirby "pose[d] a threat of serious physical harm, either to the officer[s] or to others." *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

First, by plaintiffs' account, the Ranger was not moving in an aggressive or reckless manner, but was actually being maneuvered so as to avoid hitting any persons or vehicles. Moore testified that the Ranger was slowly rolling backwards without its backup lights on, and that it was angling around the vehicles as though it was "pull[ing] out of a parallel parking spot." Thus, although Kirby may have had a reputation for paranoia and violence, as defendants note, he was not showing indifference towards the officers' safety at the time of the shooting.

Second, even if Kirby had intended to hurt someone, no one was ever in danger under the facts as presented by plaintiffs. According to Moore, Buckley was six to seven feet behind the Ranger when it began rolling, and was not in a position that it could have reached. In fact, under Moore's testimony, it was Buckley who placed himself in potential danger by moving towards the rolling Ranger instead of fleeing or simply remaining where he was. Moore stated that Buckley walked towards the Ranger's rear as it reversed in his general direction, continued to pursue the Ranger after moving onto the embankment even as it began to roll in the opposite direction, and finally got even closer by turning and "scurrying" sideways up the embankment towards that vehicle. Even in this final position, however, Buckley was still two feet to the Ranger's side, and thus not in its path. Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive. *See Sigley v. City of Parma Heights*, 437 F.3d 527, 534-35 (6th Cir. 2006); *Estate of Starks v. Enyart*, 5 F.3d 230, 233-35 (7th Cir. 1993).

Likewise, neither Carrier, Duva, nor anyone else was ever in danger if plaintiffs' account is accepted. The parties concede that Carrier was standing to the Ranger's passenger side at all times,

and consequently could not have been struck as the Ranger moved backwards and then forwards.[2] And both Moore and plaintiffs' experts place Duva behind the rear of the Silverado when the Ranger moved forward. Because the Ranger was supposedly blocked in by the Silverado, it could not have reached Duva to injure him. For this reason, Kirby also could not have harmed any motorists or bystanders, as defendants assert, as he would not have been able to escape the tight space.

Finally, and critically, defendants had sufficient time under plaintiffs' account to assess the situation before firing several rounds at Kirby. Moore estimates that the Ranger had been moving slowly, that the Ranger had been stationary for a few seconds before Buckley began shooting, and that another five to six seconds passed between when Buckley stopped shooting and when Duva began.[3] Moore also stated that the incident may have taken up to two minutes to play out. Under these facts, this was not, as defendants allege, a situation that required a "split-second" decision, *see Graham v. Connor*, 490 U.S. 386, 397 (1989), nor one where "a [possibly] dangerous situation evolved quickly to a safe one before the police officer[s] had a chance to realize the change," *see Smith v. Cupp*, 430 F.3d 766, 774-75 (6th Cir. 2005). Even if defendants were in close proximity to the Ranger and were thus unable to determine initially that Kirby did not pose a risk, each had an adequate opportunity to realize before shooting that the Ranger had stopped moving and that no one was in its path. We are mindful that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving. . . ." *Graham*, 490 U.S. at 397; *see also Bouggess v. Mattingly*, 482 F.3d 886, 893-94 (6th Cir. 2007). However, the fact that a situation unfolds relatively quickly "does not, by itself, permit [officers] to use deadly force." *Smith*, 430 F.3d at 775. Here, even without "the 20/20 vision of hindsight," *see Graham*, 490 U.S. at 396, a jury could conclude that reasonable officers would not have perceived an immediate threat.

## B. Clearly Established Right

Furthermore, it would have been clear to reasonable police officers that defendants' conduct was unconstitutional. At the time of the shooting, it was clearly established under *Tennessee v. Garner*, 471 U.S. at 9, 11, that police officers may not fire at non-dangerous fleeing felons such as Kirby. *See Bouggess*, 482 F.3d at 894-95. In *Garner*, the Supreme Court held that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." 471 U.S. at 11. "Where the suspect poses no immediate threat to the officer and no threat to others," it observed, "the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id*.

Although *Garner* did not, as defendants point out, involve the roadside execution of a search warrant, its holding was clear enough to have placed defendants on notice that their conduct was unconstitutional. *Garner* made plain that deadly force cannot be used against an escaping suspect who does not pose an immediate danger to anyone. That rule applies here, where reasonable police officers in defendants' positions would not have perceived a threat. This conclusion is not changed by the fact that the seizure occurred on a roadside or in an attempt to execute a search warrant. As

---

[2] Although Carrier was standing in the roadway, the record shows that traffic in that lane had stopped. Carrier was thus not at a risk of being struck by another vehicle that was sufficient to justify shooting Kirby.

[3] At oral argument, the issue arose of whether Duva in particular actually "seized" Kirby within the meaning of the Fourth Amendment. According to the record, neither of Duva's shots actually struck Kirby, but instead hit the front bumper and grill of the Ranger. That fact alone does not, however, necessarily entitle Duva to summary judgment. A police officer who shoots at a suspect, yet misses, may nonetheless have seized that individual where, for example, the shots impair the suspect's movement, or where the shooting officer failed to prevent his fellow officers from using excessive force. *See Floyd v. City of Detroit*, 518 F.3d 398, 405-06 (6th Cir. 2008). Because Duva neither raised this issue below nor briefed it before this court, we decline to address it. *See Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 831, n3 (6th Cir. 2007). Nothing in this ruling, however, prevents Duva from raising this argument before the district court in the future.

this court has observed, "'[g]eneral statements of the law' are capable of giving clear and fair warnings to officers even where 'the very action in question has [not] previously been held unlawful.'" *Smith*, 430 F.3d at 776-77 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Finally, *Brosseau v. Haugen*, 543 U.S. 194 (2004), upon which defendants rely heavily, does not require a contrary result. In that case, the Supreme Court held that a police officer who shot at a suspect fleeing in a car was entitled to the protection of qualified immunity because, even assuming that a constitutional right had been violated, the right had not been clearly established. After fleeing on foot for 30-45 minutes, the suspect there, Haugen, entered a vehicle parked in his mother's driveway. Fearing that Haugen had a gun, the officer ran up, pointed her gun at Haugen, and ordered him to turn the vehicle off. After Haugen repeatedly ignored her commands, the officer shattered the driver's side window with her gun, unsuccessfully tried to grab the keys, and struck Haugen with her gun. Undeterred, Haugen started the vehicle and began to drive in reverse towards parked cars containing occupants. Fearing for the safety of those individuals, as well as for that of police officers on foot in the immediate area, the officer shot at Haugen. The Supreme Court concluded that the officer's actions fell in the "'hazy border between excessive and acceptable force'" because, unlike in *Garner*, the suspect had created a substantial risk of danger. *Id.* at 201 (quoting S*aucier v. Katz*, 533 U.S. 194, 206 (2001)). Because the same cannot be said here, Kirby not having presented a risk under the factual version on appeal, *Brosseau* does not preclude a finding that the right at issue was clearly established.

## IV.

For the foregoing reasons, we affirm the denial of summary judgment.