[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13992

_____

D.C. Docket No. 2:15-cv-01585-JHE

MARCUS UNDERWOOD,

Plaintiff - Appellant,

versus

CITY OF BESSEMER, THE,
a municipality,
NATHANIEL RUTLEDGE,
individually and in his official capacity as
Chief of Police for the city of Bessemer,
DANIEL CECIL PARTRIDGE,
individually and in his official capacity as
a law enforcement officer for the City of
Bessemer Police Department,
CHRISTOPHER ASARISI,
individually and in his official capacity as
a law enforcement officer of the City of
Bessemer Police Department,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 2, 2021)

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

WILSON, Circuit Judge:

Plaintiff-appellant Marcus Underwood appeals the district court's grant of summary judgment to defendants-appellees Officers Daniel Partridge and Christopher Asarisi, the City of Bessemer, Alabama (Bessemer or the City), and former Bessemer Chief of Police Nathaniel Rutledge (collectively, Defendants). Underwood claims that the district court erred in granting qualified immunity to Officers Partridge and Asarisi on Underwood's Fourth Amendment excessive force claim. He further argues the district court erred in finding that the City was not subject to municipal liability under 42 U.S.C. § 1983. After a review of the record, and with the benefit of oral argument, we affirm the district court's judgment.[1]

_____

[1] After oral argument the Defendants filed a Federal Rule of Appellate Procedure 28(j) letter in an attempt to submit supplemental authority. In response, Underwood filed a motion to strike the letter, claiming that it did not comply with Rule 28(j). The letter reasserts arguments from the briefs and cites to cases that were available to the Defendants before oral argument, and so we agree that it exceeded the scope of Rule 28(j). Therefore, we grant Underwood's motion to strike the Defendant's Rule 28(j) letter.

## I.    Background

The following facts are largely undisputed: On the night of June 14, 2014, Dana Darby was at her home at 1628 Holbrook Avenue in Bessemer, Alabama. Around midnight, she heard people arguing, followed by two "pops" that she thought sounded like gunshots.  Her partner, Elizabeth Harrington, called the police and anonymously reported the incident: she told the 911 dispatcher that it sounded like a domestic dispute between a male and a female, that the people were yelling loudly, and that she heard what she thought sounded like two gunshots. The dispatcher transmitted this message to Bessemer officers who were on duty. Officers Partridge and Asarisi (collectively, Officers) responded and separately headed to the area in their marked patrol cars.

Holbrook Avenue is a two-lane residential street that has a grassy median separating the northbound and southbound lanes.  Officer Asarisi arrived first and parked on the edge of the median with his car facing south on the northbound side of Holbrook—that is, his car was parked facing in the wrong direction.  Officer Partridge arrived soon after and parked in the same manner about 10-to-15 feet behind Officer Asarisi.  Neither Officer had his police sirens on when they arrived. There was a parked but running car with its lights on facing north (the correct direction) in the same northbound lane about 15-to-20 feet from Officer Asarisi's patrol car.  When the Officers got out of their vehicles, they noticed two Black men

3

on the street, near the running car. The two men—Underwood and Ray James—were speaking loudly as if they were arguing.

Officer Asarisi could see the men from the waist up and did not perceive them to be armed. Officer Partridge was unable to judge whether James or Underwood had anything in their hands. When the men saw the Officers, Underwood said they were just "clowning" and he and James dispersed. James headed into the yards between two nearby houses and Underwood walked toward the driver's side door of his car. At this point, Officer Asarisi reported that he did not perceive the men to be threatening but believed the men did not want to be around the Officers and were attempting to leave. While Underwood walked toward his driver's side door, Officer Asarisi told Underwood not to get into the car. Underwood again insisted the men were just clowning and got into his car.

Meanwhile, Officer Partridge was focused on James. He began walking across the street pointing his flashlight toward James, yelling to Officer Asarisi to "watch it" in reference to James. Officer Partridge cannot remember how far across the street he made it, but he remembers that he was "toward the far side of the street," meaning he was closer to the yards where James was located rather than the grassy median.

At the same time, Underwood put his car in drive but did not accelerate; the car began to coast northbound towards the Officers. The car moved toward Officer

4

Asarisi, who was standing on the side of his patrol car.  Initially, Officer Asarisi did not feel threatened, though he thought Underwood was trying to leave.  Again, he told Underwood to stop, but Underwood did not stop and the car continued coasting down the street.  Underwood's car came close to Officer Asarisi—so close, Officer Asarisi testified, that he had to press his body up against his police vehicle—but it did not touch him and passed him while still at a coasting speed. Asarisi described the coasting speed of the car as "taking the foot off the brake" and moving "under its own idling power":

> Q.  You indicate that Mr. Underwood put the vehicle in drive and began rolling towards you. What do you mean by rolling?
>
> A.  Like I said before, just simply taking the foot off the brake and letting the vehicle coast forward under its own idling power.

Around this time, Harrington stepped out onto her porch and was watching the encounter.  She saw Underwood slowly coast past Officer Asarisi.  Harrington says she only heard Officer Asarisi yell "stop" once, but he claims that he yelled it multiple times.  Officer Partridge also claims that he heard Officer Asarisi yell stop multiple times and that he similarly yelled at Underwood to stop.  At this point, Underwood and his car were about eight feet from Officer Partridge; Asarisi was behind Underwood's car and Partridge was in front of the car.

Both sides accept that Underwood did not completely stop his car, despite the commands to do so, he was driving at a slow speed where both Officers

5

believed he would stop, and his car passed by Officer Asarisi before any shooting

began. It is also undisputed that at some point around this time Officer Partridge

began shooting at Underwood and continued to fire as Underwood's car made

contact with and passed Officer Partridge, and Officer Asarisi also then began

shooting at Underwood. And it is undisputed that the Officers shot at Underwood

about 20 times, hitting him five or six times. What happened in the moments

leading up to the shooting and the chronology of these events, however, is where

the parties' version of events diverge.

Underwood's version of events is primarily based on Harrington's statement

and eye-witness testimony since Underwood does not have an independent

recollection of the incident. Underwood's story is that, while Officer Partridge

was walking back across the street, he stopped in the middle of the road in front of

Underwood's car, drew his gun, and pointed it at Underwood. Underwood does

not dispute that his car continued rolling forward very slowly. He claims that, at

this moment, Officer Partridge fired his gun at Underwood. Only then, *after* the

shots were fired, did Underwood accelerate his vehicle, which struck Officer

Partridge—though he was not hit hard enough to be injured. Underwood relies on

the following exchange between Harrington and Underwood's attorney:

> Q. Do you recall telling Detective Williams that [Underwood's] car was going maybe 30 miles an hour?
>
> A. No.

6

Q. Would you disagree now that the car was going maybe 30 miles an hour?

A. I would disagree.

Q. Again, you haven't read the transcript of your conversation with—

A. Can we go back? You said the 30 miles an hour.

Q. Sure.

A. When? When going 30 miles an hour? At what part? Because after the shots were fired, he may have been going 30 miles, accelerating.

. . . .

A. Okay. When you said, "Was he going 30 miles an hour," I just want to make clear that it was after he passed [Officer Asarisi] that he may have been going—he was going very slow past the officer.

[Q.] Was it after or before the officers began shooting at the vehicle?

[A.] The 30 miles an hour was after he was being shot, the car was being shot at.

Harrington also claims that before shots were fired she saw Underwood's car going around Officer Asarisi ("the tall, thin police officer"), but she did not know where Officer Partridge was at that time. She said that the car was not accelerating as it passed Officer Asarisi, but instead was moving at the "same rate of speed the entire time." Further, she testified that it looked like Underwood had to go onto

7

the median to get around Officer Asarisi. She then said that once Underwood was about 20 feet in front of Officer Asarisi, Officer Asarisi stood in the middle of the road directly behind Underwood's car, "turned with both hands and shot at least seven times into the back of his car, back window."

Harrington testified that she was only able to observe Officer Asarisi fire his weapon and didn't know where Officer Partridge ("the stocky officer") was:

> Q. So you only observed the tall, thin officer firing his weapon?
>
> A. Yes.
>
> Q. Again, at the time that he did that, you don't know where the other officer, the stocky officer was?
>
> A. Correct.

So Harrington's testimony, which Underwood relies on to support his story, tells us that: (1) Underwood's car did not accelerate until after shots were fired; (2) the shooting did not begin until Underwood's car had gone 20 feet past Officer Asarisi; and (3) Harrington had lost sight of Officer Partridge at this time.

The Officers tell a different story—specifically that Underwood's car accelerated *before* any shooting began. They claim that Officer Partridge never stopped walking and that he was approaching the driver's side of Underwood's car while yelling "stop" when he realized it was still moving toward him. It was at this point, according to the Officers, that Officer Partridge drew his weapon. Officer

8

Partridge claimed that as he was walking back towards Underwood's car, it was moving "very slowly." He testified that he continued walking toward Underwood's car because he thought Underwood was going to stop:

> Q. Okay. And you pointed your weapon at Mr. Underwood; is that correct?
>
> A. Yes, sir.
>
> Q. And why did you do that?
>
> A. Because the vehicle was driving toward me. And he was not—we had been yelling at him to stop, myself and Officer Asarisi. And he slowed down. And that's when I continued to walk toward the driver's side, because I thought he was going to stop.
>
> Q. Did he slow down as if he was going to stop?
>
> A. He slowed down to the point I thought he was going to stop.

The Officers agree that Underwood's car slowed down as if to stop, but claim that Underwood then looked at Officer Partridge, revved the engine, and abruptly accelerated towards him and hit him. Officer Partridge testified:

> Q. Was [the acceleration] before or after you began shooting?
>
> A. That was—he accelerated before I began shooting.
>
> Q. You're certain of that?
>
> A. Yes, sir.
>
> Q. Had Officer Asarisi started shooting?
>
> A. No, sir.

9

In the light most favorable to Underwood, it was the acceleration that caused Officer Partridge to view Underwood's car as a deadly weapon. Officer Partridge testified: "It was a dangerous weapon when I—when I was in front of the vehicle. The vehicle continued to accelerate towards me. That's when it was a deadly weapon." Officer Partridge feared for his safety when the vehicle accelerated: "Then when the vehicle accelerated—I heard the engine accelerate. And when he accelerated, I feared for my life. I thought he was trying to kill me." Officer Asarisi also testified that Underwood was accelerating straight at Officer Partridge, and that Officer Partridge fired the first round "[a]fter Underwood accelerated and struck [Officer Partridge]."

While Officer Partridge was clear that the acceleration happened *before* any shooting, his testimony about exactly when Underwood's car hit him is less clear. Officer Partridge testified that he fired his first shot only as he was hit by the car:

> My first shot is when he impacted me with the car. It was towards the windshield area of the car. And then as my body rotated with the car, I fired. But I had to take a step back to keep from falling, because it knocked me off balance. And I continued to fire into the car as it went by.

So this first possible sequence is hitting with shooting only on impact. Elsewhere, however, Officer Partridge indicated his shooting was to stop the accelerating car from hitting him. Specifically, when he was asked to describe what led him to discharge his firearm he claimed: "When the vehicle was coming towards me, like

10

I said, I thought [Underwood] was using deadly force against me. So that's when I was trying to stop the threat, to stop him from hitting me." So this second possible sequence is shooting right before the hitting to stop the car from hitting him. But later in a declaration he again represented that Underwood's car hit him just as he started shooting. Regardless, he concedes that he was not injured from the hitting incident. At bottom, no matter the sequence of the hitting and shooting, both Officers' testimonies are clear that the acceleration came first, that what changed the encounter was Underwood's acceleration of the car, and that the acceleration came before any shooting at all. Nonetheless, in this appeal, we must accept Underwood's version that the shooting came before any acceleration.

Furthermore, under Underwood's version of the facts, Officer Partridge did not stay on the side of the road or the driver's side of Underwood's car but walked and stopped in front of the coasting or slow-moving vehicle and drew his gun. Officer Partridge explained that he knew the car was moving and also that he walked back across the street towards the driver's side. For instance, he testified that he heard Officer Asarisi tell Underwood to stop "multiple times." He also claimed: "Once I heard Asarisi yelling at whoever was in the car to stop, that's when I started walking back towards his direction, which is back across the street, but towards the driver's side of the vehicle." Later in the deposition he was asked again about this situation. He testified that he was going to assist his fellow officer

11

for his safety but admitted nothing "prevented" him from remaining on the side of

the road:

> Q. There was nothing that prevented you from staying on the side of the road with Mr. James, was there?
>
> . . . .
>
> A. Yeah. But Officer Asarisi yelling at him to stop got my attention. And I was going to assist my fellow officer for his safety, because I'm not sure what was going on.
>
> Q. You couldn't assist your fellow officer after the car passed?
>
> A. That's not what I perceived at the time.
>
> Q. Well, you perceived the car was a dangerous instrumentality?
>
> A. Yes, sir.
>
> Q. And yet you stepped out in front of it?
>
> A. It was a dangerous weapon when I—when I was in front of the vehicle. The vehicle continued to accelerate towards me. That's when it was a deadly weapon.
>
> Q. Why in the world would you step out in front of a deadly weapon?
>
> A. I couldn't tell from where the headlights were exactly what was going on. I was reacting in seconds to the situation.
>
> Q. But there's nothing that prevented you from remaining in a safe place on the other side of the road, was there?
>
> . . . .

12

A. No, sir.

Additionally, the Officers had differing testimony as to what Officer Partridge did when he was in front of the car. Officer Partridge ultimately said that he was walking the entire time and did not stop in front of the moving vehicle. Officer Asarisi, however, claimed that Officer Partridge stopped in the middle of the street. It is true that Officer Partridge responded "no" when he was asked whether he intentionally placed his body in front of the car. And he did say that he couldn't tell from Underwood's headlights exactly what was going on. But in the light most favorable to Underwood, and for purposes of summary judgment, we must accept that Officer Partridge was safely on the side of the road, saw Underwood's vehicle moving forward "very" slowly, walked in front of the moving vehicle, and stopped and drew his weapon, pointing it at Underwood.

While some of the above events (such as the timing of the acceleration and Officer Partridge's position) are disputed, the parties agree that after Officer Partridge's initial shooting into Underwood's windshield, the Officers shot at Underwood as he drove away, and that Underwood eventually crashed into a house up the street. After this Underwood was immediately taken to the hospital and had to undergo emergency surgery.

The internal affairs office of the Bessemer Police Department investigated this incident. The Chief of Police at the time, Nathaniel Rutledge, claimed that it

13

was department policy to conduct such an internal investigation when officers are involved in a shooting. As part of this process, the Officers were interviewed. In separate interviews, both Officers reported that the dispatcher identified a Black male with a gun when she transmitted her message about the domestic dispute. However, after reviewing the audio and transcript of the dispatcher's statement it was clear that she never actually mentioned the race of anyone involved in the dispute, and the Officers ended up recanting their statements later in their depositions.

When the Bessemer Police Department conducts officer-involved shooting investigations, it makes a determination as to the officer's liability. Specifically, the department will assign one of four conclusions: (1) exonerated, (2) sustained, (3) not sustained, or (4) unfounded. Here, it recommended that the Officers be exonerated. Chief Rutledge was unaware what standard of proof the investigation team used but accepted the recommendation.

As relevant here, Underwood brought this suit against the Officers, alleging they used excessive force against him in violation of the Fourth Amendment. He also claimed that the City should be subject to municipal liability under 42 U.S.C. § 1983. And last, he claimed the Defendants should be liable for various state-law

14

offenses.[2]  After discovery, both parties moved for summary judgment on the

Fourth Amendment claims and the issue of municipal liability.  The district court

granted the Defendants' motion, finding that the Officers were entitled to qualified

immunity.  Additionally, it found that the City was not subject to municipal

liability because there was no underlying Fourth Amendment violation, and even if

there was, Underwood did not point to a policy or custom that caused

Underwood's injury.  Last, the court dismissed Underwood's state-law claims,

finding that the Officers were entitled to state-agent immunity and that Underwood

abandoned his state-law claims against Rutledge and the City.  This appeal

followed.

## II.    Standard of Review

We review de novo the denial of summary judgment, viewing the evidence

in the light most favorable to the non-movant.  *Feliciano v. City of Miami Beach*,

707 F.3d 1244, 1252 (11th Cir. 2013).  "When considering a motion for summary

judgment, including one asserting qualified immunity, 'courts must construe the

facts and draw all inferences in the light most favorable to the nonmoving party

---

[2] Underwood argued that all of the Defendants should be liable for battery, assault, and the tort of outrage under Alabama law.  He also claimed that Rutledge and Bessemer should be liable for negligent hiring and negligent supervision under Alabama law.  Underwood does not appeal the district court's dismissal of his state-law claims against Bessemer or Rutledge.  While he does appeal the district court's finding that the Officers are entitled to state agent immunity, he does not specifically address his underlying state-law claims.  Because we ultimately agree that the Officers are entitled to state agent immunity under Alabama law, we do not individually analyze his state-law claims.

and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'" *Id.* at 1252 (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (citation and quotation marks omitted).

### III. Qualified Immunity

First, we address Underwood's argument that the district court improperly granted the Officers qualified immunity at the summary judgment stage. He contends that a jury should have decided this question.

But before jumping into our qualified immunity analysis, we reiterate that the parties tell two stories where the sequence of events differ. Underwood claims that Officer Partridge stopped in front of his car, began shooting at him, and thus caused Underwood to accelerate to drive away, and in doing so he hit Officer Partridge with his car. The Officers claim that Officer Partridge drew his weapon as Underwood's car moved toward him, shooting only when Underwood accelerated at him (either to stop Underwood's accelerating car from hitting Officer Partridge or at the same time that Underwood's accelerating car impacted

16

him). At the summary-judgment stage we must construe the facts in the light most favorable to the non-movant, Underwood, and draw all reasonable inferences in his favor. *Feliciano*, 707 F.3d at 1247.

To sort out the chronological sequence, we must determine the timing of two key events: (A) the moment at which the first shot was fired; and (B) the moment at which Underwood accelerated.

As Underwood contends, Harrington's testimony establishes that Underwood accelerated only *after* shots were fired. In contrast, both Officers testified that Underwood's car revved up and accelerated before any shots were fired. His car was moving very slowly under its own idling power, it looked like he was going to stop, but he did not stop, Officer Partridge was eight feet away, and Underwood's acceleration escalated the encounter. Nonetheless, at this stage we must accept Underwood's sequence of events: the first shots were fired and only then did Underwood accelerate. We use these facts to consider whether the Officers are entitled to qualified immunity at summary judgment.

A government official who is sued individually is entitled to qualified immunity "unless the law preexisting the [] official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the [] official was doing would be clearly unlawful given the circumstances." *Morton v. Kirkwood*,

17

707 F.3d 1276, 1280 (11th Cir. 2013) (citation and quotation marks omitted). A police officer cannot obtain qualified immunity unless he establishes that he was acting within his discretionary authority.[3] *Id.* After he has made this showing, the burden shifts to the plaintiff, who must show the officer is not entitled to qualified immunity. *Id.* at 1281. At that stage, we ask two questions: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) if so, "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). Although we can analyze these two questions in any order, and a finding that one is not present is enough to grant qualified immunity, *id.* at 242, it is often important to give due weight to each consideration in order to avoid insulating liability for wrongful conduct in the future. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1155 (2018) (Sotomayor, J., dissenting) (explaining that skipping the first step in the qualified immunity test can result in decisions that "insulate[] [an officer's unconstitutional] conduct from liability").

Considering the facts in the light most favorable to Underwood, we disagree with the district court's finding that there was no constitutional violation. However, the district court alternatively explained that even if there was a Fourth

---

[3] Underwood concedes that the Officers were performing discretionary functions on the night of June 14, 2014.

18

Amendment violation, the Officers did not violate clearly established law.  We

agree with that conclusion, which is sufficient for us to affirm the district court's

order.  We address these findings in turn.

### A. Did the Officers Use Excessive Force?

We look to the underlying merits of a constitutional claim to determine if a

plaintiff's rights were violated.  Underwood's excessive-force claim is brought

under the Fourth Amendment.

"[A]ll claims that law enforcement officers have used excessive force . . .

should be analyzed under the Fourth Amendment and its 'reasonableness'

standard[.]"  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted); *see*

*also Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019) ("The use of

deadly force by the police is a seizure subject to the Fourth Amendment's

requirement of reasonableness.").  Courts consider the facts of the case "from the

perspective of a reasonable officer on the scene with knowledge of the attendant

circumstances and facts, and balance the risk of bodily harm to the suspect against

the gravity of the threat the officer sought to eliminate."  *Morton*, 707 F.3d at 1281.

We consider the totality of the circumstances in making this determination.

*Graham*, 490 U.S. at 396.

It is true that we have "upheld an officer's use of force and granted qualified

immunity in cases where the [plaintiff] used or threatened to use his car as a

19

weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009); *Pace v. Capobianco*, 283 F.3d 1275, 1277 (11th Cir. 2002) (finding that officer was entitled to qualified immunity when he shot a suspect after a fifteen-minute high-speed car chase in which the suspect drove "dangerously"). But we must consider the totality of the circumstances, and "where the plaintiff did not use or did not threaten to use his car as a weapon, we have rejected an officer's use of deadly force." *Morton*, 707 F.3d at 1282–83; *see also Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003).

In *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985), the Supreme Court set out three factors relevant to determining when deadly force is reasonable (the *Garner* factors). Under the *Garner* factors, deadly force is generally reasonable "when an officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Hunter*, 941 F.3d at 1279.

"Although these factors are useful, we cannot apply them mechanically, and we must still slosh our way through the factbound morass of reasonableness." *Morton*, 707 F.3d at 1281 (citation and internal quotations omitted). We conclude

20

that under the totality of the circumstances a reasonable jury could find that the

Officers' use of deadly force was unreasonable and therefore unconstitutional. *Id.*

As to the first *Garner* factor, it is not clear that the Officers had probable

cause to believe that Underwood posed a threat of serious physical harm to the

Officers or others. The Defendants argue that the speed of the vehicle is

immaterial, citing to *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005), for

support. They contend that even if Underwood did not accelerate his car, the fact

that he did not stop entirely and his car moved forward gave the Officers cause to

believe his car posed a threat of serious harm to Officer Partridge. They contend

that if the car was moving at all—even if only idling and inching forward—the

Officers could use deadly force to stop it. We reject this argument for several

reasons.

First, in the light most favorable to Underwood, both Officers directly tied

their shooting to Underwood's acceleration of his vehicle. They both testified that

before the acceleration, they thought Underwood's car was moving very slowly

and was going to stop but then he accelerated. And at one point in his deposition,

Officer Partridge testified it was the car's acceleration that caused him to view it as

a deadly weapon, stating, "The vehicle continued to accelerate towards me. That's

21

when it was a deadly weapon." The speed of the car at the time of the shooting is thus material here.[4]

Second, although there is no Eleventh Circuit decision on point, this case is more like *Vaughan* or *Morton* than *Robinson*. In *Vaughan* and *Morton* we found that the suspects drove their cars in a non-aggressive, non-threatening manner and did not pose a threat of serious harm. *Morton*, 707 F.3d at 1280–83 (reversing a district court's grant of qualified immunity at summary judgment when the plaintiff saw the police vehicle, denied accelerating his car and claimed that he drove away in a non-threatening way, was merely coasting, did not see anyone in front of his car, and came to a stop before an officer shot him seven times); *Vaughan*, 343 F.3d at 1330 (reversing summary judgment granting qualified immunity when a plaintiff alleged that although he was speeding, fleeing and earlier had accidentally hit the rear of a police car, he at the time of the shooting was in a lane "clear of traffic" and had "made no aggressive moves to change lanes before [the officer] fired" three rounds into the truck without warning). Just like in

---

[4] In addition to *Robinson*, the district court also relied heavily on *Terrell v. Smith*, 668 F.3d 1244 (11th Cir. 2012), finding that the threat of harm here was even greater considering that Underwood's car hit Officer Partridge. But *Terrell* does not apply here. In *Terrell* we found that the fact a suspect hit an officer with a car *before* the officer used deadly force elevated the threat of harm, making it "far graver and more immediate." *Id.* at 1254. Under Underwood's facts, however, Underwood accelerated and hit Partridge after the Officers began shooting. *Terrell*, therefore, is not relevant in determining whether there was a Fourth Amendment violation as we must accept that the alleged unlawful seizure—the Officers' use of their weapons—occurred before Officer Partridge was hit with the car. In any event, it is the timing of the acceleration, not the hitting, that is the critical disputed fact here.

*Morton* and *Vaughan*, Underwood's version of events indicates that he did not use his vehicle in a threatening way. Underwood claims the Officers began to shoot at him while he was still eight feet away from Officer Partridge and was not accelerating or driving aggressively but inching forward so slowly that it looked like he would stop. Taking the facts in the light most favorable to Underwood, as we must, it was not until *after* the Officers began shooting that Underwood accelerated forward. Accepting these facts as true, a reasonable jury could find that Underwood did not pose a threat of serious physical harm to the Officers or others.

Third, *Robinson* is materially distinguishable from this case. In *Robinson*, a cooperating suspect identified a Ford Escort carrying his drug suppliers. *Robinson*, 415 F.3d at 1254. The Escort stopped behind a civilian car and two suspects (the driver and a passenger) exited the Escort and were arrested. *Id.* The third suspect exited and reentered the Escort. *Id.* The officer was standing in between the Escort and the civilian car in front of it. *Id.* The officer was "only two to four feet [away from the Escort] at the most." *Id.* The officer pointed his gun at the suspect, verbally identified himself as "Police," and warned him to put his hands up. *Id.* The suspect made eye contact with the officer and grinned as the Escort slowly began to move forward. *Id.* The officer then shot through the windshield of the Escort and killed the suspect. Based on the totality of the circumstances—

23

emphasizing that the officer "was standing in a narrow space between [] two vehicles," the suspect disobeyed orders to put his hands up, and the officer "had only 2.72 seconds to react before getting crushed between the two cars"—we found that the officer acted reasonably. *Id.* at 1256. Thus, the slow speed of the car in *Robinson* did not mitigate or eliminate the threat of serious harm. *Id.*

Here on the other hand, Officer Partridge was about eight feet away from Underwood's car—at least twice as far away as the officer in *Robinson*—and there is no record evidence that there was a vehicle or other object behind Officer Partridge. Officer Partridge was not standing in a narrow space between two cars but in the middle of the road with space to move. Accordingly, there was no risk that he could be similarly crushed, and the threat of harm in the two cases differs. And without the disputed acceleration, even the Officers testified that they believed Underwood's car was going to stop. Further, under the factual version most favorable to Underwood, Officer Partridge was safely on the side of the road and saw the car moving, but continued walking over to the front of the car and stopped in front of the car. The combination of these facts—Officer Partridge's positioning and distance from the car, Underwood's slow rate of speed, described as mere idling, and the various other surrounding circumstances—would allow a jury to reasonably infer Underwood did not pose a risk of serious harm to the

24

Officers or anyone else.  They are also relevant to the second and third *Garner* factors.

The second and third *Garner* factors, though less important after our determination that a jury could find no threat of serious harm, also weigh in Underwood's favor.  As to the second factor—the need to prevent escape, a reasonable jury could find that the Officers did not need to use deadly force to prevent escape because Underwood was moving at a very slow rate of speed, he was not fleeing an arrest but merely disregarding the Officers' orders to stop, and the Officers could easily access their patrol vehicles.  As to the third factor— warning of the intent to use deadly force, a reasonable jury could find that the Officers had time to yell stop multiple times, that during the yelling Underwood's car went slowly 20 feet past Officer Asarisi, and yet Officer Partridge was still eight feet away from the car, which was still slowing as if to stop.  Under Underwood's version of the facts, therefore, a reasonable jury could also find that the Officers could have warned of the intent to use deadly force.

For these reasons, we find that a reasonable jury could accept Underwood's version of the facts and find that the Officers violated Underwood's Fourth Amendment rights when they shot him.  Of course, a jury could instead credit some of the Officers' testimony and come to the same conclusion as the district court—that the Officers' actions were reasonable.  But these sorts of issues should

25

not be decided at the summary judgment stage. *See Vaughan*, 343 F.3d at 1331–32.

Additionally, the district court should have recognized the inconsistencies within Officer Partridge's own testimony and between the Officers' testimony. This is especially true given that at this stage the court must accept the nonmoving party's version of the facts as true and make all reasonable inferences in favor of that party—in this case Underwood. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007) (reiterating that a court cannot make credibility determinations at summary judgment and instead must accept the facts in the light most favorable to the nonmoving party). If the court had done so, it would have had to accept that Officer Partridge walked and then stopped in front of the slow-moving car.[5]

In sum, we conclude that there are disputes of material fact—about Underwood's rate of speed, when he accelerated, and how and why Officer Partridge was positioned—which could preclude a finding of summary judgment here. Accepting Underwood's version of the facts as true, we find that the Officers' use of deadly force violated Underwood's Fourth Amendment rights.

---

[5] Underwood also argues that the jury should be able to consider whether: (1) the use of force was reasonable throughout the entire encounter and (2) Officer Asarisi could have intervened. However, Underwood does not point to facts in the record to argue there is a dispute of fact as to these issues. He merely claims the jury should have decided these questions. Because he does not demonstrate a dispute of fact as to these issues, we do not address them.

26

While Underwood was not obeying orders to stop and was evading talking to the police, Underwood was not driving aggressively or in a threatening way. Rather, his car was merely idling and inching forward slowly. Although Officer Partridge claims that he walked in front of the vehicle out of concern for Officer Asarisi's safety, the car was still eight feet away, he did not warn Underwood that he would use deadly force, and there was no critical need to prevent a known dangerous person from escaping and harming others. *See Vaughan*, 343 F.3d at 1331–32. While we find that Underwood's facts make out a constitutional violation, the Officers are still entitled to qualified immunity if the violation was not clearly established. *Morton*, 707 F.3d at 1282.

### B. Was the Right Clearly Established?

We will find a right is clearly established if the plaintiff (1) "produce[s] a materially similar case" that is binding precedent, (2) "point[s] to a broader, clearly established principle that should control the novel facts in his situation," or (3) "show[s] that an official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Id.* (internal quotation marks omitted and alterations adopted). The Supreme Court has emphasized that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

27

The Officers are entitled to qualified immunity because Underwood has not demonstrated that his rights were clearly established. *See Morton*, 707 F.3d at 1282. As an initial matter, Underwood does not point to a factually similar case, nor does he contend that a broader principle applies here. And probably for good reason, as this case is not directly analogous to other binding qualified immunity cases involving vehicles and the use of deadly force. We also find that the Officers' actions were not so obviously excessive, but rather within "the hazy border between excessive and acceptable force." *See id.* That is, even though we hold that accepting Underwood's facts as true the Officers violated his constitutional rights, we recognize that the law was not clearly established at the time of this incident. We therefore affirm the district court's grant of qualified immunity.[6]

---

[6] We recognize that Underwood cites out-of-circuit cases for the proposition that a police officer acts unreasonably by placing himself in potential danger. *See Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) (finding a Fourth Amendment violation when, under the plaintiff's version of the facts, the suspect's car "was moving slowly and in a non-aggressive manner, could not have hit any of the officers, and was stationary at the time of the shooting," and noting the officer unreasonably "placed himself in potential danger by moving toward the rolling [car]"); *see also Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (finding that there was a "key dispute" regarding whether an officer stepped in front of an accelerating car and thereby "unreasonably created the encounter that ostensibly permitted the use of deadly force"). While these cases are generally instructive, their facts are not identical to those presented here. And regardless, they are not binding because they are out-of-circuit cases. Therefore, *Kirby* and *Enyart* would not have placed the Officers on notice that their actions were potentially violative of Underwood's constitutional rights. *See Morton*, 707 F.3d at 1282 (explaining that a law is clearly established in the Eleventh Circuit by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose).

28

IV.    *Monell* **Liability**

Next, we consider Underwood's argument that the district court erred in granting the City summary judgment as to his claim that it should be subject to liability under 42 U.S.C. § 1983.

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court held that a municipality can be held liable under § 1983 (*Monell* liability).  To impose *Monell* liability, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  In certain circumstances the need to provide training may be "so obvious" that a municipality's failure to train officers can rise to the level of deliberate indifference and result in the municipality being subject to *Monell* liability.  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific officers . . . the need for . . . training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the. . . city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable . . . .") (footnotes omitted).

29

However, a municipality cannot be found liable under a theory of respondeat superior. *Id*. at 392.   Instead, the plaintiff must demonstrate the municipality's policy or custom was the "moving force" behind the alleged constitutional violation. *Id.* at 389; *see also Monell*, 436 U.S. at 694.

Underwood claims that the City should be subject to *Monell* liability because it failed to adequately train the Officers.  According to Underwood, the Officers arrived on the scene in "cowboy mode"—under the impression that everyone is a suspect, and everyone has a gun—and this, says Underwood, escalated the situation and caused the use of unlawful deadly force.  Underwood argues that had the City adequately trained the Officers, they would not have employed this "cowboy mode" mentality.  Additionally, Underwood claims that the City and Rutledge should be held liable under a theory of ratification.  *See Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (recognizing that a police department's "persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct" and is therefore subject to liability under § 1983).  That is, Rutledge, who had final policymaking authority, ratified the Officers' unconstitutional conduct when he received the flawed internal investigation and did nothing about it.  Both of these arguments fail.

Underwood has not demonstrated that the City failed to train the Officers. To prove failure to train, Underwood would have had to provide "some evidence

30

of a pattern of improper training" and "show that [the City] was aware of the deficiencies in [its] program." *Skop*, 485 F.3d at 1145. Underwood does not provide evidence of either a pattern or knowledge of improper training. He only claims that both Officers were in "cowboy mode" on the night of the incident. While the Officers said it is "standard practice" to assume everyone is a suspect when arriving at a scene where shots were fired, Underwood does not allege any other past incidents where Bessemer officers' use of this method allegedly resulted in constitutional violations. And he similarly does not demonstrate that the City was aware that its training on the use of deadly force was insufficient.

And Underwood's ratification argument is foreclosed by *Salvato*. In *Salvato* we acknowledged that when a plaintiff demonstrates that a police department has "persistent[ly] fail[ed] to take disciplinary action against officers," it can create an inference that the department ratified the misconduct. *Salvato*, 790 F.3d at 1297. However, we declined to find ratification when a sheriff "fail[ed] to investigate a single incident." *Id.* at 1296.

Underwood argues that the Bessemer Police Department's investigation was inadequate and that Rutledge's subsequent approval of the investigation qualified as ratification. But Underwood points to no other occasions of flawed investigations where the City or Rutledge failed to take disciplinary action when its officers allegedly violated the law.

31

Therefore, we affirm the district court's grant of summary judgment to Defendants as to this issue because Underwood failed to demonstrate that the City should be subject to liability under § 1983.

## V.    State-Agent Immunity

Finally, we address Underwood's argument that the district court erred in finding that the Officers were entitled to immunity under Alabama law.

Under Alabama law, a state agent is entitled to immunity from civil liability when "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers." *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006) (emphasis omitted). To have immunity as a state agent in Alabama, the defendant must first prove that he was acting in a discretionary function within the scope of his duties at the time of the alleged incident. *Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005). Then, the burden shifts to the plaintiff to demonstrate, with substantial evidence, that one of the exceptions to the state-agent immunity doctrine applies. *See Ex parte Utils. Bd. of Foley*, 265 So. 3d 1273, 1281 (Ala. 2018) (per curiam). The doctrine does not apply:

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully,

> maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Id.* at 1280 (internal quotation marks omitted).

Underwood concedes that the Officers were acting in a discretionary function on the night of June 14th but claims that a jury should have been able to decide whether one of the exceptions to the state-agent immunity doctrine applies. Underwood's claim fails. He does not specifically address either of the two exceptions or why they might apply, but merely claims that "based upon the multitude of disputed facts, a jury should have been allowed to decide whether Partridge and Asarisi's conduct" entitled them to immunity. This is not enough to withstand summary judgment. *See Ex parte Price*, 256 So. 3d 1184, 1191 (Ala. 2018) (finding that plaintiff did not prove an exception to state-agent immunity by substantial evidence when he did not explain which exception applied). Thus, we affirm the district court as to this issue.

**AFFIRMED.**

33